UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Darvin M., <br><br> Petitioner, <br><br> v. <br><br> Pamela Bondi, Attorney General; Kristi Noem, Secretary, U.S. Department of Homeland Security; Todd M. Lyons, Acting Director of Immigration and Customs Enforcement; Marcos Charles, Acting Executive Associate Director for Enforcement and Removal Operations; David Easterwood, Acting Director, St. Paul Field Office, Immigration and Customs Enforcement; and Ted H. Kim, Associate Director of USCIS Refugee, Asylum and International Operations Directorate, <br><br> Respondents. | No. 26-CV-0437 (SRN/EMB) <br><br><br> **ORDER** |

Cameron Lane Youngs Giebink, Wilson Law Group, 3019 Minnehaha Ave., Minneapolis, MN 55406, for Petitioner

Ana Voss and Julie T. Le, U.S. Attorney's Office, 300 S. 4th St., Minneapolis, MN 55415, for Respondents

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Petition for a Writ of Habeas Corpus ("Petition") [Doc. No. 1] and an Emergency Motion for a Temporary Restraining Order ("TRO Motion") [Doc. No. 2] filed by Darvin M., who seeks immediate release from detention. Respondents oppose the Petition. (Resp'ts' Opp'n [Doc. No. 8].)

1

The Court has taken the Petition and TRO Motion under advisement on the papers. For the reasons set forth below, the Petition is granted and the Court orders Darvin M. to be released immediately. Because the Court grants the Petition, it denies the TRO Motion as moot.

I. **BACKGROUND**

Petitioner is a citizen of Nicaragua who entered the United States as a refugee on October 26, 2023. (Pet. [Doc. No. 1] ¶ 2; Pet'r's Ex. A.)  His application for lawful permanent resident status is pending with United States Citizenship and Immigration Services ("USCIS"), which issued a notice of receipt on February 22, 2025.  (Pet. ¶ 2; Pet'r's Ex. D.)  Petitioner also has a valid work permit, which remains valid through March 17, 2029.  (*Id.* ¶ 2 & Ex. C.)

On January 19, 2026, ICE agents arrested Petitioner at his place of employment, the Hilton Homewood Suites in St. Louis Park, Minnesota, which was housing ICE agents deployed to Minnesota to participate in Operation Metro Surge.  (Pet. ¶ 4.)  Respondents were previously aware of Petitioner's legal status and had verbally informed his boss that he would not be detained if he reported to work.  (*Id.* ¶ 5.)  Despite their reassurance, Respondents arrested Petitioner as part of Operation PARRIS [Post-Admission Refugee Reverification and Integrity Strengthening] in Minnesota, a process ostensibly "designed to re-examine refugee cases approved in recent years."  (Pet'r's Ex. H at 2.)  "But resettlement agencies say the rollout has included early-morning arrests, detentions, family separations and little to no explanation of what refugees are accused of or where they are

being taken." (Pet'r's Ex. H.) Petitioner has committed no crime, is not a suspect, and was arrested in the absence of a warrant. (Pet. ¶ 6.)

That same day, January 19, Petitioner filed the instant Petition and TRO Motion, seeking release. He requested an order enjoining Respondents from transferring him outside the District of Minnesota. He also requested that Respondents be enjoined from interviewing or speaking with him regarding his refugee application process, the validity of his refugee status, the prior approval of his refugee status, any termination of his refugee status, his application for lawful permanent residence status, or any other matter relevant to his refugee status or pending application for lawful permanent residence status in the absence of counsel and with at least 72 hours' advance notice as to the purpose of the interview and standard of law to be applied. (TRO Mot. at 2.)

Also on the day of Petitioner's arrest, January 19, the Court issued an Order to Show Cause, ordering Respondents to respond to the Petition, and granting in part Petitioner's TRO Motion as follows:

> Respondents are **ENJOINED** from moving petitioner outside of Minnesota until further order of the Court, so that petitioner may consult with his counsel while the Court is considering his petition, and so that there is no risk that removal of petitioner from Minnesota will deprive this Court of jurisdiction over this petition. If petitioner has already been removed from Minnesota, respondents are **ORDERED** to immediately return petitioner to Minnesota.

(Order to Show Cause [Doc. No. 5] at 2.)

Respondents violated the Order to Show Cause by transferring Petitioner to the El Paso Camp East Montana, in Texas, and not immediately returning him to Minnesota. (Second Giebink Decl., Ex. B [Doc. No. 9-3].) He remains in Texas. Moreover, one of

3

the express purposes of enjoining Respondents from moving Petitioner outside of Minnesota was to enable him access to counsel. (Order to Show Cause at 2.) On January 24, 2026, his counsel, Cameron Giebink, filed a declaration detailing his total denial of access to Petitioner. Mr. Giebink recounts his unsuccessful efforts to communicate via telephone with Darvin M. on January 23 and 24, on multiple occasions, due to disconnected calls, redirected calls, and disconnected numbers. (Giebink Jan. 24, 2026 Decl. [Doc. No. 10] ¶¶ 1–19.) When he contacted Respondents' counsel, Ana Voss by email, she directed him to the DHS duty attorney. (*Id.* ¶ 16.) Mr. Giebink left a voicemail message for the DHS duty attorney, but received no response. (*Id.* ¶¶ 17–18.) Mr. Giebink has been unable to contact his client in any way since his detention on January 19. (*Id.* ¶ 19.)

In response to the Petition, Respondents state that Petitioner entered the country as a refugee over a year ago and that his status had not been adjusted to lawful permanent resident at the time of his arrest. (Resp'ts' Opp'n at 2–3.) Thus, according to Respondents, 8 U.S.C. § 1159(a) authorizes Petitioner's mandatory detention. (*Id.*) Respondents do not address the Constitutional arguments that Petitioner raises in his Petition.

## II.   DISCUSSION

### A. Statutory Authority

Following lengthy screening and vetting procedures, refugees may be lawfully admitted to the United States under 8 U.S.C. § 1157. USCIS, *Refugees*, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees (last visited January 15, 2026). Admission as a refugee is a distinct lawful immigration status. After residing in the United States for one year, refugees are required to apply for adjustment of status to

lawful permanent residence.  8 U.S.C. § 1159(a).  Specifically, 8 U.S.C. § 1159(a) states that an individual admitted as a refugee who has been physically present in the United States for over one year "shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title."  8 U.S.C. § 1159(a).

Section 1159 only contemplates DHS's "custody" of refugees for the limited purpose of conducting an inspection necessary to adjudicate adjustment of status under § 1159(a)(2).  *E.E. v. Bondi*, No. 26-cv-314 (JWB/DTS) (D. Minn. Jan. 17, 2026) [Doc. No. 7 at 7].  Respondents conflate custody with mandatory detention, (Resp'ts' Opp'n at 2–3), but "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).  As Petitioner correctly observes, "custody" contemplates the exercise of control absent physical detention, and refugees were not previously detained, therefore, they cannot be "returned" to detention.  (Reply [Doc. No. 9].)

> Nothing in § 1159 authorizes detention untethered from that function [of inspection and examination]. Nor does the statute mandate detention, prescribe a minimum duration of custody, or reclassify an admitted refugee as an "arriving alien" or "applicant for admission." The cross-reference to § 1225 provides the procedural mechanics of inspection, not an independent or mandatory detention regime. Custody under § 1159(a) is therefore lawful only to the extent it serves the inspection and examination contemplated by the statute.

5

*Roman N. v. Trump*, No. 26-cv-282 (JWB/DLM) (D. Minn. Jan. 19, 2026) [Doc. No. 6 at 5].

In fact, none of the cross-referenced provisions in 8 U.S.C. § 1159(a) from which custody following "inspection and examination for admission" may lawfully emanate—§§ 1225, 1229a, or 1231—support Petitioner's detention.

First, mandatory detention under § 1225 only applies to certain arriving aliens who are inadmissible, 8 U.S.C. § 1225(b)(1), or who are considered "applicant[s] for admission," *id.* § 1225(b)(2)(A). *See also Maldonado v. Olson*, 795 F. Supp. 3d 1134 (D. Minn. 2025) (distinguishing between detention under §§ 1225(b)(2) and 1226(a)). Petitioner is not "arriving." He has been residing in the United States. Nor is he a person who has "not been admitted or paroled," as he was lawfully admitted to the United States on October 26, 2023. Accordingly, neither §§ 1225(b)(1) nor 1225(b)(2) subject Petitioner to mandatory detention.

Second, § 1231 does not support Petitioner's continued detention either. Section 1231 provides for the mandatory detention and removal of noncitizens ordered removed, directing that "[d]uring the removal period, the Attorney General shall detain the alien" during the 90-day "removal period" that generally runs from date that a removal order is administratively final. 8 U.S.C. § 1231(a)(1)(A)–(B), (a)(2)(A). Detention may be extended beyond 90 days if DHS determines that the person is "a risk to the community or unlikely to comply with the order of removal." *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) (citing 8 U.S.C. 1231(a)(6)). Nothing in the record demonstrates that Petitioner has been ordered removed, therefore he cannot be detained in accordance with § 1231. *Abdi*

6

*F.W. v. Trump*, No. 26-cv-208 (KMM/SGE) (D. Minn. Jan. 21, 2026) [Doc. No. 7 at 6] (finding detention under § 1231 inapplicable where no evidence showed petitioner had been ordered removed from the United States).

Finally, § 1229a applies to "removal proceedings" and contains no standalone detention provisions. *See* 8 U.S.C. § 1229a. Even when removal proceedings are underway, "most aliens may be released on bond or paroled." *Zadvydas*, 533 U.S. at 683 (citing 8 U.S.C. § 1226(a)(2), (c)). Again, nothing here demonstrates that Petitioner has been placed in removal proceedings. The detention provision that corresponds to § 1229a is 8 U.S.C. § 1226, but mandatory detention under § 1226(c) only applies to noncitizens who have been convicted of serious crimes, and discretionary detention under 1226(a) requires the issuance of a warrant. There is no showing here of a conviction for a serious crime, let alone any crime, nor is there evidence of a warrant. Accordingly, detention under § 1229a is inapplicable to Petitioner.

Section 1159's implementing regulations confirm the limited purpose of DHS's "inspection" under the statute. *See* 8 C.F.R. § 209.1(b), (d). After one year of presence in the United States, a refugee must submit an adjustment application and biometrics, and USCIS determines whether an interview or further examination is necessary. *Id*. Detention is not mandatory under the regulations, which do not contemplate prolonged custody in the absence of the statutory inspection, in any event.

Likewise, the agency's own guidance confirms that a refugee's failure to apply for adjustment of status "is not a sufficient ground to place them in removal proceedings, and therefore not a proper basis for detaining them." ICE Policy Memorandum 11039.1, issued

7

on May 10, 2010 by ICE's Director, James Chaparro, addresses "Detention of Refugees Admitted Under INA [Immigration and Nationality Act] § 207 Who Have Failed to Adjust to Lawful Permanent Residence Status." (Pet'r Ex. E (P.M. 11039.1).) Again, here, Petitioner did not fail to apply for adjustment of status. USCIS received his application, but almost one year later, the agency has thus far failed to adjudicate it.

As to the decision to detain or release an unadjusted refugee, the ICE Policy Memorandum provides express time limits:

> Except in the case of emergency or other extraordinary circumstances, upon the arrest of an unadjusted refugee *upon reasonable belief of removability*, a DRO [Detention and Removal Operations] Field Office must determine, *no later than 48 hours after the arrest*, whether to release the individual or issue a Notice to Appear (NTA), Form I-862, indicating the removal charge(s) applicable to the alien. *See* 8 C.F.R. § 287.3(d); Memorandum from Asa Hutchinson, Undersecretary for Border and Transp. Sec., Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Dep't of Justice Inspector Gen. 2 (Mar. 30, 2004). *If it becomes apparent earlier that no removability ground applies, the individual must be released promptly*.

(*Id.*) (emphasis added). If a refugee is to be issued an NTA, it must be served "promptly," and, in any case, within 72 hours of arrest, absent an emergency or other extraordinary circumstances. (*Id.* at 3.) Ultimately, if ICE fails to reach a determination about placing an unadjusted refugee in removal proceedings within 48 hours, "the DRO Field Office should release the alien with a reminder that the INA imposes an obligation upon him or her to apply for adjustment of status under section 209(a) and to provide DHS with updated address information. . . ." (*Id.* at 3–4.)

Regarding the effect of the failure to adjust status on removability, the ICE Policy Memorandum states,

8

> A refugee may not be placed in removal proceedings based on a failure to adjust status or to apply for adjustment of status because an alien's failure to adjust status or apply for adjustment under INA § 209(a) is not a ground of removability. Therefore, the only way DRO may place an unadjusted refugee in proceedings is if a violation of the INA can be established that is unrelated to the alien's failure to adjust, such as fraud or a criminal conviction that forms the basis for a charge under INA §§ 212 or 237.

(*Id.*)

Respondents do not challenge Petitioner's claim that he applied to adjust his status to that of lawful permanent resident when he was eligible to do so and that he is awaiting a decision from USCIS. Instead, they claim that Petitioner's detention is mandatory because he entered the United States on October 26, 2023, and despite their receipt of his pending application for adjustment of status on February 22, 2025, "it has been more than one year since Petitioner entered the United States." (Resp'ts' Opp'n at 2.) But refugees are not eligible to apply for adjustment of status until they have "been physically present in the United States *for at least one year*," 8 U.S.C. § 1159(a)(1)(B) (emphasis added), and USCIS controls the length of the review process. Even if a refugee filed an application for adjustment of status at the earliest possible opportunity—366 days after entry into the United States—Respondents still control the length of adjudication. The reason that Petitioner has not acquired permanent resident status is because Respondents have failed to adjudicate his pending application for permanent residence. It has been pending with USCIS for nearly a year. "Respondents cannot justify [Petitioner's] continued detention through an open-ended assurance that they will get around to conducting the inspection and examination required by § 1159(a), which presents their only identified basis for

9

continued detention." *Abdi F.W.*, No. 26-cv-208 (D. Minn. Jan. 21, 2026) [Doc. No. 7 at 8.].

Respondents' claims that Petitioner's detention "is not indefinite," his status is "preliminary," and that his "inspection will occur in due course" fail to justify his detention. (Resp'ts' Opp'n at 2–3.) There is no indication of whether and when inspection will occur. This Orwellian situation, in which a lawfully admitted refugee's personal liberty hangs in the balance, is rooted in USCIS's delay. Vague assurances of inspection "in due course" cannot serve as a lawful basis for Petitioner's open-ended detention.

Again, when "unadjusted" refugees are arrested for an inspection under § 1159, ICE must determine whether to release the individual or issue an NTA indicating the removal charges "no later than 48 hours after the arrest."[1] (Pet'r Ex. E (PM 11039.1) at 2.) Respondents have unlawfully detained Petitioner for far longer than 48 hours. He has been detained since January 19, 2026 and ICE has now detained him for five days. His detention is unsupported under the law.

---

[1] Certain provisions of the INA and its implementing regulations, not at issue here, also contain time limits for review and examination. See 8 U.S.C. § 1357(a)(2) (addressing powers of immigration officers without a warrant and requiring that certain arrested aliens "shall be taken *without unnecessary delay* for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.") (emphasis added); 8 C.F.R. § 287.3(d) (providing that for aliens arrested on criminal charges without warrant, subject to certain exceptions, "a determination will be made *within 48 hours of the arrest*, except in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time, whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.").

In sum, Respondents have had ample opportunity to conduct an examination and inspection under § 1159(a). Under the circumstances here, in which Petitioner's detention has far exceeded the permissible 48-hour bounds and Respondents have violated an order of this Court, the appropriate habeas remedy is immediate release. *See Munaf v. Geren*, 553 U.S. 674, 693 (2008) (describing release as the "typical remedy" for "unlawful executive detention").

### B. Constitutional Authority

Petitioner has also established that he is being detained in violation of the Fifth Amendment. Noncitizens are entitled to due process of the law under the Fifth Amendment. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Sanchez-Valasco v. Holder*, 593 F.3d 733, 737 (8th Cir. 2010). To determine whether civil detention violates a detainee's Fifth Amendment due process rights, courts apply the three-part test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under *Mathews*, courts weigh the following three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

"The interest in being free from physical detention" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 531 (2004). Not only have Respondents infringed on this liberty interest, by moving Petitioner from detention in Minnesota, where his legal counsel resides, to Texas, they impeded his legal representation by making

communication with his counsel impossible. Thus, the private interest at stake here supports a finding of a Fifth Amendment violation.

As to erroneous deprivation, courts must "assess whether the challenged procedure creates a risk of erroneous deprivation of individuals' private rights and the degree to which alternative procedures could ameliorate these risks." *Günaydin v. Trump*, 784 F. Supp. 3d 1175, 1187 (D. Minn. 2025). Respondents detained Petitioner and failed to afford him an "inspection" within 48 hours, then moved him to Texas, in violation of a court order, and failed to return him, in violation of the same court order. Their procedures created an erroneous deprivation of Petitioner's private rights when their own conduct—their failure to adjudicate his application for adjustment in status—is the only basis for all the needless, cruel conduct that followed. The risk of erroneous deprivation also supports the finding of a Fifth Amendment violation.

Finally, consideration of the Government's interest, including fiscal and administrative burdens that additional or substitute procedural requirements would entail, clearly supports the finding of a Fifth Amendment violation. All that was required of Respondents was to adjudicate Petitioner's application. They could have "inspected" him by simply reviewing his application in a timely fashion and making an appointment, if necessary, rather than by uprooting him from his home, family, and job, subjecting him to days of detention, flying him to Texas in contravention of court order and at taxpayer expense, depriving him of access to legal counsel, and subjecting him to further trauma, all for the stated purpose of "inspection." The Constitution does not abide this conduct. The

private interests at stake here far outweigh the "burden" of Respondents' alternative procedural requirements.

In sum, the Court finds that all three *Mathews* factors support Petitioner's claim that Respondents have violated his due process rights under the Fifth Amendment. Respondents' Constitutional violations, as well as their statutory violations, in detaining Petitioner support Petitioner's immediate release. *See Munaf*, 553 U.S. at 693.

### III.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Petitioner Darvin M.'s Emergency Petition for a Writ of Habeas Corpus [Doc. No. 1] is **GRANTED**.

2. Respondents shall release Petitioner from custody **IMMEDIATELY**, but no later than noon on January 25, 2026 CST.

3. Respondents shall confirm Petitioner's release within 2 hours of his release.

4. Petitioner's Motion for Temporary Restraining Order [Doc. No. 2] is **DENIED AS MOOT**.

Dated: January 24, 2026

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge